May it please the Court, Your Honor, Philip Stern on behalf of Trisha Sprayberry, I request three minutes for reserve for rebuttal. All right, Counsel, please be reminded that the time shown on the clock is your total time remaining. I understand. Thank you, Your Honor. Trisha Sprayberry asked that the Court reverse the judgment of the District Court, which granted summary judgment on PRA's affirmative defense of the bona fide error under 1692K sub c of the Fair Debt Collection Practices Act. Under that affirmative defense is PRA's burden of proof to prove three elements. One of those elements is the maintenance of procedures reasonably adapted to avoid the error. And how would those procedures have made a difference in this case? If the law is unsettled in Oregon to this day, what would the procedures have shown? Okay, so the procedures that PRA had would never have presented, they weren't designed to and they would never have prevented the violation here. Well, Counsel, we're talking about legal research, right? It's a legal question. And it would be resolved today the same way it was resolved when the research was done. You look at whatever case law exists, you look at the statute, and you conclude it's an unsettled question of Oregon law. And wouldn't you do the same thing today if you were trying to answer the question? Wouldn't you come to the same conclusion? I think in Kaiser, which recognized that a mistake of state law can be, it didn't really articulate exactly under what circumstances a mistake of law would be a bona fide error. What if we had determined that this was a question of fact? Well, I mean, they talked about it being that the question of determining state law could be treated as a mistake of fact. But in Kaiser, the court first began by, you know, a similar kind of claim, that the UCC applied and it's shorter statute of limitations, and that the debt collector then went ahead and attempted to collect it as if it were not a time-barred debt. So what's your answer to the question? So my answer to the question is the CFPB, which was recognized in Kaiser, gave us the answer of what the procedure is. And if I can, and I'll refer to it. It's answering the question. It does answer the question. The question is, what procedure that didn't exist would answer the question today? All right, so this is what the CFPB said. A debt collector who is ultimately unable to determine with certainty whether a debt is time-barred can avoid liability under, and then it's the section of the reg dealing with time-barred debts, by refraining from bringing or threatening to bring a legal action while, in most states, continuing with non-litigation collection activities. I would liken this to. So you're suggesting that you must err on the side of assuming the answer is favorable to the debtor, even though the law is unsettled? Is that your position? Is that how you read Kaiser? When I read Kaiser in connection with reading the elements of 1692 KC, yes. In other words, I would liken it to this. If you're driving down a road and it's ambiguous whether the speed limit is 50 or 65, certainly the way you ensure that you won't get a speeding ticket is drive at 50 miles an hour. Don't exceed 50. And that's the same thing here. I'm not sure you're engaging my question. My question is what procedure, what would the procedure have resulted in? The answer is the same. If the law is ambiguous, it's ambiguous and unsettled. You're telling me, well, if that's the case, then you should err on the side of assuming that the law is favorable to the debtor. I don't read Kaiser that broadly. I'm not saying that Kaiser says that's what you do. The question is what's the procedure? I mean, we start with that there was no procedure. But it doesn't matter because we're talking about a legal research question. You go to the books. You try and figure out what the answer is. You conclude the law is unsettled. It would be the same whether you did it today, tomorrow, or three weeks ago. If that's the situation, then there's no procedure. Then we're not talking about really falling within. But no procedure besides legal research could ever answer the question. And the problem here is that when you perform the legal research, there is no answer to the question until the Oregon Supreme Court someday interprets Oregon law to tell us what the legal answer is. So if we're going to have a rule that says if there's an open question of state law that the debt collector can opt for what benefits the debt collector the best, and then if it turns out that that violates the FDCPA, it's got an absolute defense. We're not talking about a bona fide error anymore because we haven't satisfied the elements of the bona fide error statute. Well, that's your argument that you haven't satisfied it, but you haven't been able to articulate what process should have been implemented that was not implemented. Okay. That's the crux of that defense. What is the process that should have been implemented other than conducting legal research that was not implemented? So the first thing was to even recognize, which PRA never did, recognize that the UCC was a possible source of the statute of limitations. And once having determined that, I'm saying is we have some guidance from the CFPB. When they rejected the requirement, you know, rejected a proposal that required that the debt collector knew or should have known that the statute of limitations was violated, when they rejected that, they explained that here's how a debt collector makes sure that they don't violate trying to collect on a time-bar debt. Those are best practices. Those are best practices, but it's not a violation of the law to fail to do those. You can't show the error. That's the problem you have, counsel. You cannot show the error of law when the answer is it's ambiguous. There is no answer. It's not our burden to show it. It's PRA's burden to show. Didn't the district court assume that there was an error of law? The district court assumed that there was an error of law. That's why we reach the bona fide error defense, correct? Correct. So this analysis only kicks in if we assume that the four-year statute of limitations applies. Is that correct? That's correct. So we're starting with the conclusion that the four-year statute applies. Well, the assumption, not the conclusion. There's a difference. Okay. There's an assumption that the four-year, because the court didn't determine one way or the other which statute of limitations applied. So we're going even if the four-year statute of limitations applied. Right. Fine. Whether we call it an assumption or not, but certainly the analysis of the BFE is that this was a violation. Okay. Otherwise, there's no point in having the discussion about the BFE unless we're— You're using Kaiser to suggest that the answer is there must be a violation because the debt collector didn't assume in favor of the debtor that it was the shorter statute that applied. Is that your argument? I apologize, Your Honor. I may have missed the first word. I'm not sure. You're assuming that the error lies in not giving the benefit of the doubt to the debtor. And using the four-year statute of limitation instead of six. No, I think— And I'm having a hard time making that assumption. No, no. That's not the assumption. I think the assumption is that when PRA sent these letters, that they were misleading in terms of inferring that these were enforceable debts. But if the six-year statute applied, then the inference would attach, would it not? That the threat to pursue litigation was a legitimate threat. But if that's the question, then we don't get to the bona fide error analysis. Well, the problem is that you can't show the error. That's the problem we have. We can't show the error. I can show the violation. No. Well, that's only a violation if we conclusively determined that the four-year statute of limitations applied. That's the problem. And the law is unsettled. So you cannot definitively show an error. Well, you say definitively. I mean, Kaiser certainly instructs that the first thing you do is you determine whether the UCC applies or not. And Kaiser instructs that if there is no authoritative decision from the highest court or from the court, you make what I learned in law school was an eerie guess. Is your best case that intermediate New Jersey case to support your analysis here? Because the other cases that we looked at seemed to favor the conclusion that this is not a sale of goods under the UCC. Well, in terms of the cases that are out there, it's true. There's an intermediate appellate Illinois decision and an intermediate New Jersey appellate decision. Minority view. I don't know if it's a minority view because I really the other two cases that they cite, I don't think directly address that issue. But they talk about the law would be unsettled on that as well. What's that? At best, the law would be unsettled on that issue as well. So even if we say it's unsettled right now, Kaiser says the first thing we do is determine, decide what the law is. Not that it's unsettled. Decide first. In the district court, the judge said, if we assume that the UCC applies so that, and therefore the letter sent were misleading and did violate the FDCPA, then we can go look at the bona fide error statute, which has those three elements of lack of intent, proving, the PRS approved that it was not intentional, that it was in good faith, and that it happened notwithstanding the fact that they had procedures in place that were reasonably adapted to prevent this from happening. And they had no procedures that would have prevented this from happening. I'm sorry? Our standard of review is de novo, correct? It's de novo, yes. So we do not have to follow the same path that the district court followed. Agreed? That's correct. Okay. That's correct. But we're asking for reversal of that summary judgment. And, yes, it is our position that if we follow the order of analysis that's in Kaiser, the first question is, does the UCC apply? And we say the UCC would apply. I acknowledge you've got the Schellinger case out of Illinois and you've got the Thiel case out of New Jersey. But if we look at it, let's look at the UCC. The UCC says it applies to not just sales of goods but transactions in goods. And then it also says that's 2102. 2106, it says that its coverage extends to contracts relating to the current or future sale of goods. And these contracts, the – I thought the credit card, I think it was, I can't remember whether it was the Walmart credit card or the Target credit card, also provided for the purchase of services. It's services from the retailers. And loans, right? Well, the Walmart had a minimal – it said if at the time you're purchasing a good, if you want to get an extra $20 back in cash, you can. But if we're talking about obtaining a cash advance, a loan, on one of these credit cards, that's not involving the sale of goods, is it? But we're not looking at whether it's purely a – that it's limited to a sale of goods. You have the Oregon case that dealt with the sale of a business, but it was looked at that it was primarily involving the sale of goods. And Target and Walmart, yes, they may provide some services, maybe put together the barbecue that you just bought or assemble a bike. But those are services, but they're tangential to – Pay for the eye exam. I'm sorry? Pay for the eye exam. Pay for the eye exam. Okay. An eye exam at the optometrist can be. But the primary purpose of this was the sale of goods, the stuff that's on the shelves, on the racks. But these are credit cards. I mean, I'm having a hard time understanding why PRA was wrong in concluding that this Oregon six-year statute that otherwise applies to loans and credit under credit card transactions would be the applicable statute of limitations. Because I would say is the credit card – this is not a credit card in the common sense of sort of a general all-purpose credit card. This is not a credit card that can be used to manage personal finances. This is not like buying a car where the car serves as collateral for the purchase price. You don't go to your Ms. Sprayberry and tell her you want the goods back if she fails to pay her account on the credit card. Well, on the Walmart card it is. The Walmart card expressly provides a purchase money security interest. It does? It does, and it's in the credit card agreement. Okay. You wanted to save some time. Thank you, Your Honor. Good morning, Your Honors. Gretchen Harris Sperry on behalf of Portfolio Recovery Associates. I'd like to help orient the Court in the discussion today, sort of return in a big-picture way to what the analysis is that the Court has to apply here, and keeping in mind two important principles. The first is the posture of this case and how it arrives to this Court on summary judgment, specifically granting summary judgment in PRE's favor on the bona fide error issue. The second thing to also keep in mind is what question exactly this Court is being asked to decide. Judge Tolman, Judge Rawlinson alluded to the fact that under Kaiser, there is a provision that allows for this Court to predict what Oregon state law would be if the question otherwise was unclear for purposes of applying the FDCPA. In this case, under either statute of limitations, whether it's the six-year or the four-year, in both cases, this Court can affirm the judgment of the district court. There's no dispute as to the first, the six-year statute of limitations. There's no dispute, as Judge Tolman mentioned, that if the six-year statute applies, then the letters that were sent to Ms. Sprayberry clearly fell within the statute of limitations for PRE to be able to collect the debt, so there's no FDCPA violation. If, as the district court here determined, that presuming for argument's sake that the four-year UCC statute of limitation applied, of course, under Kaiser, then the analysis under the bona fide error defense applies, and here PRE, anticipating that possibility, submitted evidence in the form of testimony from PRE employees and other evidence to support its bona fide error defense. What other evidence do we have beside the deposition testimony of the in-house lawyer who performed the research but didn't even bother to memorialize it in a research memo? Well, that is the evidence. The testimony is sufficient evidence to support the summary judgment. You said there's other evidence. What's the other evidence besides because I said so? I appreciate that, Your Honor, and primarily, of course, you're right. It's the testimony of Mr. Nordyke. So is there any other evidence? I don't believe that there's no documentary evidence. That was kind of a gloss on the deposition testimony? Apologize, yeah. On the issue of the good faith defense, I think if we're assuming that there was an error and that the four-year statute of limitations applies, and it seems to me that the analysis that our sister court did in Johnson v. Riddle where they said, you know, we're assuming a mistake of law is a type of mistake of fact, which is what we held in Kaiser, right, that can support the bona fide error defense, but they went through what kind of legal research, you know, what kind of due diligence would be necessary to support the defense, and they applied the same stringent standards for showing not only that a generalized procedure but that it was actually implemented and that conclusory statements were not enough. And here, and they said the question had to go to a jury, right, and I don't see that the question had to go to a jury. That summary judgment was not appropriate because a reasonable jury could find that the procedures used in that case were not reasonably designed to avoid the mistake. So if we're assuming a mistake was made here, I don't see what Mr. Nordyke testified to as being even as stringent as the procedure followed in Johnson v. Riddle. Well, Your Honor, I think Judge Tolman's questions to Mr. Stern sort of elucidated what the issue is with the situation where there's an unclear question of law. Right, there was an unclear question of law in Riddle as well. He said he did research, he filed a test case. Here we have no test case. We also have research from 2012 that was never updated. He asserted conclusorily that someone must have updated it, but he never updated it, and he didn't have any specifics about an updating process. That's true. It hadn't been updated from 2012 to 2016 when the letters were issued. But the system, the process that was in place, allowed for the detection of any change in the law. There were trainings that were provided annually to the employees with respect to compliance with FDCPA issues. But that's just sort of boilerplate FDCPA compliance training. I mean, the problem here is you'd have to have almost artificial intelligence to assist in surveying court decisions from around the country to see if the law was changing at all in this area. Well, Mr. Nordyke was a specialist in this area. He's an Oregon barred attorney, and so part of his responsibilities were, you know, included monitoring. Reading advance sheets and that sort of thing. Of course. Educate himself as to new cases coming down the line. If a new decision came down that changed the statute of limitations. But Mr. Nordyke didn't even realize that there was an argument, that this was an open question of law. He seemed absolutely certain that the six-year statute of limitations apply and seemed completely unaware of a published federal district court decision from Washington dealing with both Washington and Oregon law saying this is an open question of law. Well. Which he, if he had been updating his research, I presume he could have found. Of course, Your Honor. And now these procedures, of course, don't have to account for every conceivable error. They have to be reasonable under the circumstances. So, you know, in the case of the Gray case, it was from another jurisdiction. It was a district court case. It wasn't necessarily binding, and it was an application of another state's law in a different jurisdiction. In that case, the court determined there were material issues, the fact they had to go to a jury. So, I mean, at best I think it's maybe dicta as to what the actual law is. Of course. And that was Washington law, not Oregon law, right? Of course. And to the extent that, as Mr. Stern suggests, you know, the New Jersey jurisdiction looks at this as a UCC issue, that for some reason, you know, in an otherwise tripartite relationship, simply the fact that it's a branded credit card should be governed by a different classification as a sale of goods, assuming that that is a material issue. And I want to get back to your question, Judge Sung. Of course, the procedure doesn't have to be perfect. It doesn't have to account for every conceivable error. But there wasn't any other indication really within Oregon law that the Oregon courts were considering applying UCC. Well, Gray did involve both Washington and Oregon law. Isn't that correct? It did address both. But, again, given the jurisdiction and given it was not necessarily decisive in that case or binding on the Oregon courts, it wasn't overly persuasive that would put, that would suggest that a change in analysis was needed, particularly in light of the Sunshine Dairy case, which the Sanders case eventually relied on for the fact that these types of transactions are separate. You know, the account-stated transactions are separate promises. There is no, there is, regardless of what the underlying sale transaction was. And that goes all the way back to 1963. The Mormon case that Ms. Frayberry relies on in her briefing is a questionable viability, even at the time that it was issued. That's the only thing that really Ms. Frayberry points to or that we've found that even suggests that the Oregon courts would consider a UCC classification in these cases. You know, there the Oregon Appellate Court relied on West Virginia state law when there was Oregon Supreme Court law on this very subject. The dissent in Mormon even picked up on that and said, you know, when we were talking about account-stated, we don't look at the underlying transaction. We don't use that as the basis for reclassifying this as a sale of goods. The account-stated is a new agreement between the two parties that initially contracted for the credit card services. And that eventually is the analysis that Sanders applied, going all the way back to Sunshine Dairy. On the question of whether the six or four, whether we could reasonably predict that the Oregon Supreme Court would find that the six-year statute of limitations applies, I do have some questions on the facts of is there the target credit card, does that work like any other credit card that when someone pays for an item at the store, the bank pays target for that item and then essentially is fronting the money for the consumer? Is that how it works? That's exactly right. It is a traditional tripartite analysis. The only difference here is that it is a store-branded card. But again, if we're not looking at the underlying sales transactions, it doesn't matter where that money was spent. And Ms. Sprayberry hasn't really offered any persuasive reasoning for why the fact of the branding should change the way that the relationship among the debtor and the credit card servicer and the ultimate merchant, why that relationship should change. What about Mr. Stern's point that one of these cards actually attached a security interest in the goods that were purchased with the credit card to secure repayment? Because that did seem to make a difference to the Oregon courts when we were talking about purchasing cards. And that was under the Wal-Mart case? Yeah. My understanding, frankly, was that the Wal-Mart case was more distinct as an independent third-party card issuer than the Target case was, even because it was issued by Synchrony Bank through GE separately. I didn't read the agreement word for word because it went on for about 30 pages of single-space text. But I didn't see that there was a security interest arising. I'll take counsel's word for it, but we'll check. I don't recall that myself. I'd be happy to, with the court's indulgence, submit a supplemental letter. We can find it if it exists, I'm sure. Apologies, Judge. I was a little bit confused about the record on the Target card because I do think because Target, at least at the time that the Target card was issued, wholly owned Target National Bank. Is that right? That's right. Okay. And Target National Bank issued the credit card. But did Target National Bank transfer money to Target Retailer every time someone made a card transaction? Just as any other card servicer would have, yes. And then the Target credit card agreement seems to say, you know, the consumer is allowed to buy goods and services. But then there's deposition testimony that seems to limit the purchases from third parties who sell at Target stores only to goods. And where does that limitation come in? Well, once again, as an account stated, we're not looking at the underlying purchases that were made on that line of that credit card. So where it was spent, what it was spent on, doesn't transform the analysis of how we view the relationship. I understand maybe the practical, if she only bought goods, maybe that doesn't affect the analysis. But there seemed to be deposition testimony that even though someone, even though the card said, card agreement, said you could buy goods or services, that in fact she could not buy services from third-party sellers. Like she could, someone, in one of the depositions, they say she could buy glasses from the third-party automatrists, but she could not pay for the doctor's visit. Do you know where in the card agreement that limitation comes from? I don't. I have the card agreement here, if I could grab it and see if I could find that part of it. I do recall, though, that under the target card, it could be used for other in-store merchants, like Starbucks, for example, comes to mind. So it's not quite as limited as just being goods sold by target. It did have some expansion beyond that. Counsel, ER 257, paragraph 1 of the target credit card agreement, I think, contains the answer to Judge Thompson's question. Thank you, Judge Thompson. I guess I didn't bring enough stuff up to the podium. My apologies. It's here. Thank you for that. Hi, Counsel. You are rapidly getting close to the end of your time. Do you want to wrap up? Yes, Your Honors. Unless there are further questions, on behalf of Portfolio Recovery Associates, we ask that this court affirm summary judgment in PRA's favor. Thank you. Thank you, Counsel. Rebuttal. That security interest, the Walmart agreement starts on ER 178, and the agreement is called a retail installment credit agreement. And on ER 181, the bottom of the page is paragraph 10, security interest. The first sentence of the paragraph, you grant us a purchase money security interest in each item of merchandise purchased on your account to secure its unpaid purchase price until such merchandise is paid in full. And was there any effort made to foreclose on that collateral when she stopped payment on the credit card? I'm not aware that there was. Okay. I don't think there's anything on the record that reflects either way. They didn't repossess the goods like we would normally expect a car to be repossessed when the person stops making payments. That's my understanding. That's correct. I want to point out, for both of these cards, but for the sale of goods, and maybe some, to a limited extent, some tangential services and possibly getting a $20 when you're purchasing a good, but without those sale of goods, there is no liability on these cards. It doesn't exist without the purchase of goods at a Target store or at a Walmart store. It just doesn't happen. But you don't disagree that this is a tripartite agreement. The money is paid by the bank to the store as opposed to giving the money to the customer who then hands it to the seller. That's correct. It falls between, at one level, which is a direct, you know, the way that a lot of department stores did, I'm old enough to know, many years ago, that they would do it directly. And so there was buyer and seller, and so the seller was financing it. And at the other extreme is you go out and, you know, you go to Bank of America and they agree, they say, okay, you're qualified for $30,000 for a car loan, go out and buy a car. Or you go get a Visa or MasterCard or American Express card. Which has a $30,000 limitation on it, but you can use it for anything, right? Exactly, right. So I guess my question is, what difference does that make? I mean, it's still a credit card transaction for which you accrue interest on unpaid balances, penalties, attorney's fees if actions are brought to collect on the account stated. There's two differences. The first is one, what does the UCC say? And the second one is the limit on the use of the card. A regular credit card, a general purpose credit card. Do you have a case that talks about this? Because I didn't see anything focusing on the limitation of the use of the card. I'm not sure that that's legally relevant. Well, I think the field case and the unpublished earlier New Jersey Appellate Division decision McNamara talks about the difference between general all-purpose credit cards and these limited store credit cards. In other words, if I've got a credit card, I can use it. But with all due respect to the judges in those cases, I'm having a hard time seeing what the legal relevancy of that is. If it's otherwise an extension of credit to the customer for which the customer is obligated to pay interest and penalties and attorney's fees if they don't pay their account. So as far as from the consumer's perspective, they walk into, and this was in the record, you walk into a Target store, you walk into a Walmart store, an employee approaches you and says, would you like to apply for a Walmart card? Would you like to apply for a Target card? Yes. They're not necessarily aware that it's a tripartite agreement, but that's in fact what we know that that's the relationship. But if the consumer paid with an American Express card or a Visa card, there wouldn't be any difference in terms of how the transaction was processed, would there? You mean the point of sale? Yeah. I agree. You give them one credit card versus another. And if you don't pay the bill, then the card issuer comes out after you for the unpaid balance, interest and penalties, and attorney's fees for cost of collection. And the same would be true if it were a Macy's charge card that existed, you know, whatever, 30, 40 years ago. The point of sale would be exactly the same, but in that case it would be subject to the UCC, clearly. The difference in the Macy's case is that no third party is giving Macy's the money up front and lending that, essentially issuing a loan to the buyer. Right? In the old Macy's case that you're talking about, no third party gave Macy's the money for the purchase and effectively issued a loan to the consumer. Well, I don't know that that's so, because they certainly could have done accounts receivable financing. Whatever financing they did was their business. It didn't involve, you know, it's only when they started outsourcing that, that we became aware of these third party relationships. So I wouldn't make the assumption that. Well, you don't have a case that says Macy's. I do not. Got money from a third party and effectively issued a loan to the consumer, and that counts as a contract for goods, correct? That's correct. I don't have a case about that. But what I'm saying is, at that time, it was oblivious to the consumer what that relationship was. Whatever Macy's was doing or any of the other department stores were doing, that was internally done. But that was back in the days when you used to go to the grocery store and you'd charge your groceries to your open account, and then once a month you'd go in and settle up your account. I mean, that's essentially what that old Macy's card was, wasn't it? And they used to be the gas cards as well. It would be the same thing, right? You get a bill. All I'm saying is that, certainly in those circumstances, it was UCC applied. And from the consumer's perspective, it really is not really aware of any difference. But now we get to what I want to get to is how do we connect it? And I think 2106 of the UCC is what connects it. And I mentioned that before in my argument, which is it talks about that within the domain of Article II are contracts that are related to the present or future sale of goods so that these arrangements that were made between a bank and a retailer for the purpose of offering the retailer's customers an alternate way to pay for their purchase of goods is related to the present or future sale of goods. All right. Counsel, you've greatly exceeded your time. Unless there are additional questions, we understand your argument and we thank you for it. We thank both counsel for their arguments. The case just argued is submitted for decision by the court. Thank you, counsel. Thank you, Your Honor. The next case on calendar for argument is Williams v. Baskett.
judges: TALLMAN, RAWLINSON, SUNG